# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:07-00045 |
| | ) | Judge Echols |
| BARRY D. MCKNIGHT | ) | |

## MEMORANDUM

Pending before the Court is Defendant Barry D. McKnight's Motion to Suppress Evidence and Statements (Docket Entry No. 19). The Court held an evidentiary hearing on the Motion on June 7, 2007.

## I. FACTUAL FINDINGS

During the course of the evidentiary hearing, the Court heard from one witness – Sgt. Joseph Towers – an eleven year veteran of the Metropolitan Nashville Davidson County Police Department. The Court found his testimony to be credible. Based upon that testimony as well as the record in this case, the Court finds the following to be the relevant facts.

On December 31, 2006, Sgt. Towers was working on the Hermitage Precinct flex team. That team is assigned to work violent crime and drug laden areas, including the University Court area. At 11:47 p.m., dispatch reported that there was an individual with a shotgun around Carroll Street and University Court. Two cars were directed to the area but Sgt. Towers responded they

1

were not necessary as he was in the area and a person with a gun was not uncommon on New Year's Eve.[1] Sgt. Towers advised dispatch that he did not see anyone in the area with a weapon.

Shortly thereafter, dispatch contacted Sgt. Towers and informed him that they received an update and that the caller said the person with the shotgun was her boyfriend, Barry McKnight, that he had just pulled a shotgun on her, and that she ran from the apartment at 151 University Street to 63 Carroll Street. Dispatch called again to say that the girlfriend was reporting that her boyfriend, a black male, had on a white shirt and black pants and that he was now at the front door of 63 Carroll Street. The caller also advised that the Defendant was walking and that she did not think he had the shotgun any longer but that she was not sure.

The apartments on University Court are in a row and the backs of those apartments face the backs of the apartments on Carroll Street. Sgt. Towers observed an individual matching the suspect's description walking toward the sidewalk from behind the row of apartments on University Court, at the approximate location given by dispatch, i.e. around 151 University Court and 63 Carroll Street. By this time Officer Kevin Wallace had arrived on the scene.

Upon seeing a black male in white shirt and black pants, Sgt. Towers called out "Barry," whereupon the individual turned and walked towards the officers. Sgt. Towers asked him "are you Barry McKnight?" The individual answered "yes." Sgt. Towers immediately handcuffed the individual since there were other people walking around, he knew the suspect had been accused of pointing a shotgun at his girlfriend, and the officer was concerned for his and other individuals' safety.

---

[1] Sgt. Towers testified that they had frequent calls that New Year's Eve, especially about individuals with guns and shots being fired in the area.

2

The individual, who turned out to be Defendant, was read his Miranda rights. He was then patted down and asked if he had a shotgun. Defendant responded that he did have a shotgun and it was in his house. Defendant was asked if he would show the shotgun to the police and he said "yes." At all times, Defendant was extremely cooperative. He was coherent and did not appear to be under the influence of any drugs or alcohol.

Sgt. Towers and Officer Wallace followed Defendant to the apartment at 151 University Court. They entered the apartment and Defendant indicated that the shotgun was underneath the sofa. Defendant told Officer Wallace that his fingerprints would be all over the shotgun because he cleaned and buffed it.

Sgt. Towers shined his flashlight and observed a small child asleep on the sofa. Underneath the sofa he observed a shotgun which was retrieved. Defendant was then taken outside and placed in Officer Wallace's squad car.

Defendant was transported to a nearby CVS pharmacy parking lot so that the officers could complete paperwork related to the arrest. At that time, one of the officers ran the serial number from the shotgun and learned that it had been stolen in a burglary in Murfreesboro, Tennessee. Defendant claimed that his brother had given him the shotgun and Defendant did not know it was stolen.

At some point after Defendant was taken into custody, Defendant's girlfriend, Ronesha Smith was interviewed. She informed officers that Defendant had pointed the gun at her while she was in bed, resulting in a struggle. A neighbor heard the struggle and knocked on the door. After Ms. Smith responded to the knock, she was able to escape to a neighbor's home at 63 Carroll Street, where she called the police.

As a result of these events, Defendant was charged in a one-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924. The Motion to Suppress followed.

## II. APPLICATION OF LAW

Defendant argues that the police did not have a reasonable articulable suspicion that criminal activity was afoot when Sgt. Towers seized Defendant. He also claims that Defendant did not voluntarily consent to the search of his residence. The Government argues that there was probable cause to arrest the Defendant upon his initial contact with Sgt. Towers and Defendant freely consented to the search which revealed the shotgun lying under the couch.

### A. The Seizure

"Encounters between police officers and citizens can be grouped into three categories: 'consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked some questions; a temporary involuntary detention or Terry stop which must be predicated upon reasonable suspicion; and arrests which must be based on probable cause.'" United States v. Campbell, 2007 WL 1501281 at * 3 (6th Cir. 2007) (quoting United States v. Bueno, 21 F.3d 120, 123 (6th Cir.1994)). In this case, the question is whether the encounter with the Defendant constituted a Terry stop or an arrest and whether, regardless of the characterization, it was prohibited by the Fourth Amendment.

In order for a seizure to comply with the Fourth Amendment, "the police officer must have a reasonable suspicion of criminal activity to justify a Terry stop, or probable cause to justify an arrest[.]" Id. A Terry stop allows officers to briefly detain and question a suspect based upon

4

reasonable suspicion that the suspect had been or is presently involved in a crime. Hayes v. Florida, 470 U.S. 811, 816 (1985). During such a stop, a police officer may handcuff the suspect if the officer fears for his or her own safety, and the mere handcuffing does not transform the stop into an arrest. United States v. Atchley, 474 F.3d 840, 848 (6th Cir. 2007). An arrest, on the other hand, occurs when a reasonable individual in the suspect's circumstances would believe that he was in custody and not free to leave. Merkemer v. McCarty, 468 U.S. 420, 422 (1984).

In this case, the initial encounter with the Defendant was more than a Terry stop. It was an arrest. In fact, during the evidentiary hearing, Sgt. Towers candidly admitted that when he first approached the Defendant after he had confirmed that he was Barry McKnight, Sgt. Towers immediately handcuffed Defendant, placed him under arrest, and read him his Miranda warnings. Sgt. Towers also testified that he believed at the time of the initial encounter he had sufficient information with which to seek an arrest warrant.[2] See, United States v. Robinson, 2007 WL 507875 at *4 (6th Cir. 2007)("A reasonable person in defendant's position would not have believed he was free to terminate the interrogation" and therefore was in custody). Under this scenario, the Court must therefore determine whether the arrest was constitutional.

A warrantless arrest is constitutionally valid if, "at the moment the arrest was made, the officers had probable cause to make it-whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to

---

[2] Arguably, Sgt. Towers' statement that Defendant was under arrest might not be controlling since "the subjective views of a police officer who effects a detention have no bearing on whether that detention constitutes an arrest." United States v. Elston, 479 F.3d 314, 319 (4th Cir. 2007). In any event, since this Court finds that Sgt. Towers had probable cause to arrest Defendant during the initial encounter, it necessarily follows that Sgt. Towers could properly conduct a Terry stop since such a stop need only be based upon reasonable suspicion.

5

warrant a prudent man in believing that the [individual] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). "Probable cause is determined by the totality of the circumstances 'from a law enforcement officer's perspective.'" United States v. Craig, 198 Fed. Appx. 459, 462 (6th Cir. 2006) quoting, United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993). Furthermore, "[a]n eye witness's statement that he or she saw a crime committed or was the victim of a crime is generally sufficient to establish probable cause." United States v. Shaw, 464 F.3d 615, 623 (6th Cir. 2006)(collecting cases).

In this case, Sgt. Towers knew the following things when he arrested the Defendant: (1) a female caller told dispatch that her boyfriend had just pulled a shotgun on her at 151 University Court; (2) the caller had left that location and gone to an adjacent apartment at 63 Carroll Street; (3) the boyfriend was identified as a black male named Barry McKnight; (4) Barry McKnight was described as wearing a white shirt and black pants; (5) a subject matching the description, i.e. a black male wearing a white shirt and black pants was seen by Sgt. Towers in the University Court/Carroll Street vicinity; (6) when Sgt. Towers called out "Barry," the black male wearing a white shirt and black pants came towards the officers; and (7) when Sgt. Towers asked the individual whether he was Barry McKnight, the individual responded, "yes." Clearly this scenario could lead a reasonably prudent officer in Sgt. Tower's position to conclude that the individual before him was the same individual who had been identified as having pulled a shotgun on his girlfriend. Sgt. Towers had probable cause to place that individual under arrest.

6

In reaching this conclusion, the Court is not unmindful of Defendant's extensive reliance on the Supreme Court's decision in Florida v. J.L., 529 U.S. 266, 268 (2000). Reliance on that case, however, is misplaced.

In Florida v. J.L., 529 U.S. 266 (2000), "an anonymous caller reported to the Miami-Dade Police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Id. at 268. The police arrived and found a young man matching that description and a subsequent frisk revealed the presence of a gun. The Supreme Court concluded there was insufficient "indicia of reliability" to support a Terry stop, even though the tipster described a person in some detail, identified the particular bus stop where the person could be found, and alleged possession of a gun. Id. at 268. Summarizing the shortcomings of the tip, the Supreme Court stated that "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." Id. at 272.

This case is distinguishable from J.L. in at least two material respects. First, the caller was not exactly anonymous. While the Court does not know based on the record before it if Ronesha Smith gave her name to dispatch, it is clear that the caller identified herself as the girlfriend of Barry McKnight and that she was staying at 151 University Court. As the Supreme Court pointed out in J.L., an anonymous tip is less reliable than "a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." Id. at 1375. Here, even if Ronesha Smith did not initially give her name to the police, she was sufficiently identified such that the police could track her down and hold her accountable should it become necessary. See, United States v. Howard, 150 Fed. Appx. 476, 479 (6th Cir. 2005)(tip was not

7

anonymous even though investigating officer did not know informant where the informant left her name and number with the 911 dispatcher and following arrest investigating officer contacted the informant); Elston, 479 F.3d at 318 ( a "significant indicator that an anonymous informant is reliable is her disclosure of information that would enable authorities to identify her if they deem it necessary to do so").

Second, the Supreme Court in J.L. was concerned that while the anonymous caller's description tended to identify a determinate person based upon the description given, it did not provide a sound basis for knowledge of illegality. J.L., 529 U.S. at 272-73. Here to the contrary, Barry McKnight's girlfriend told the police that he had just pulled a shotgun on her at 151 University Court and that she had fled from there to 63 Carroll Street. See, Illinois v. Gates, 462 U.S. 213, 234 (1983)("if we entertain some doubt as to an informant's motive, h[er] explicit and detailed description of alleged wrongdoing , along with a statement that the event was observed firsthand, entitled h[er] tip to greater weight than might otherwise be the case"); United States v. Perkins, 363 F.3d 317, 325 (4th Cir. 2004)(J.L. dealt with a possessory offense (i.e. carrying a concealed weapon) and is distinguishable where report is made contemporaneously with the informant's observation, officers encounter suspect within minutes of initial report, and where caller was in a position to see suspects displaying and pointing rifles in a residential neighborhood).

Based upon the totality of the circumstances, the Court finds that Sgt. Towers had probable cause to arrest the Defendant.

8

**B. Consent to Search**

As a general proposition, the Fourth Amendment prohibits the warrantless search of an individual's property. United States v. Haddox, 239 F.3d 866, 767 (6th Cir. 2001). "This prohibition does not apply, however, to situations in which voluntary consent has been obtained[.]" Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).

The standards to be utilized in examining the voluntariness of a consent to search has been explained by the Sixth Circuit as follows:

> "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The burden of proving that consent was voluntary is on the government. Id. at 222, 93 S.Ct. 2041. "[C]onsent must be proved by clear and positive testimony, and, to be voluntary it must be unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion." United States v. Scott, 578 F.2d 1186, 1188-89 (6th Cir. 1978). The defendant's knowledge of his right to refuse to consent is a factor, but the government need not prove that the defendant had such knowledge to establish that consent was voluntary. Schneckloth, 412 U.S. at 226-27, 93 S.Ct. 2041.

United States v. Erwin, 155 F.3d 818, 823 (6th Cir. 1998). In short, the government bears the burden of proving consent and this must be shown "by clear and positive testimony and must be unequivocally, specifically, and intelligently given, uncontaminated by any duress and coercion." United States v. Tillman, 963 F.3d 137, 143 (6th Cir. 1992).

In this case, the Court finds that Defendant voluntarily consented to the search which revealed the shotgun under the couch. The undisputed evidence in the record reveals that after being given his Miranda rights, Defendant was asked about the shotgun and he voluntarily told the officers he would show them its location. He took the officers to the apartment located at 151 University Court and pointed under the sofa. At the time of his arrest and subsequent consent, Defendant was

9

lucid, cooperative, and did not appear to be under the influence of any drugs or alcohol. Defendant was not coerced or intimidated.

There is absolutely no evidence in the record that Defendant's consent to search was anything but knowingly and voluntarily made. Accordingly, the Court rejects Defendant's contention that the shotgun seized from underneath the couch must be suppressed.

### III. CONCLUSION

For the foregoing reasons, Defendant's "Motion to Suppress Evidence and Statements" (Docket Entry No. 19) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE